**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **TEXAS DRAIN TECHNOLOGIES, INC.,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **Civil Action No. 4:14-cv-03298** |
| **CENTENNIAL CONTRACTORS** | § | |
| **ENTERPRISES, INC. and TRAVELERS** | § | |
| **CASUALTY AND SURETY COMPANY,** | § | |
| **Defendants.** | § | |

**PLAINTIFF TEXAS DRAIN TECHNOLOGIES, INC.'S FIRST AMENDED COMPLAINT**

Texas Drain Technologies, Inc.'s ("TDT") files this Amended Complaint pursuant to Fed. R. Civ P. 15(a)(1)(B), within 21 days after service of a motion under Rule 12(b), against Centennial Contractors Enterprises, Inc. and Travelers Casualty and Surety Company and pleads the following:

## I. PARTIES

1. Plaintiff, TEXAS DRAIN TECHNOLOGIES, INC., is a Texas corporation conducting business in Texas.

2. Defendant, CENTENNIAL CONTRACTORS ENTERPRISES, INC., is a Virginia corporation with its principal place of business at 11111 Sunset Hills Rd., Suite 350, Reston, Virginia 20190-5374. Centennial has been served and has removed this lawsuit to the United States District Court, Southern District, Houston Division pursuant to diversity of citizenship between the parties and that the amount in controversy exceeds $75,000.00.

3. Defendant, TRAVELERS CASUALTY AND SURETY COMPANY, is a foreign corporation doing business as a surety in the State of Texas, and having its principal place of

business in Connecticut. Travelers has been served and has removed this lawsuit to the United States District Court, Southern District, Houston Division pursuant to diversity of citizenship between the parties and that the amount in controversy exceeds $75,000.00.

## II. BACKGROUND FACTS

4. Subcontractor, TDT brings this lawsuit against General Contractor, Centennial for damages TDT sustained as a result Centennial's breach of contract, negligent mishandling of change order requests, and false representations.

5. Specifically, in June 2013, TDT entered into a subcontract agreement with Centennial for the removal and the installation of piping in and around the grease trap inceptor at Ben Taub Hospital under Defendant Centennial's contract number 72430/ proposal number 11-065 with Harris County Hospital District ("HCHD"). (the "Agreement.") *See* Exhibit A attached. Pursuant to the Agreement, TDT performed labor and services at the direction of General Contractor, Centennial, by excavating the inlet and outlet lines, installing shoring systems, removing and disposing of existing inlet and outlet piping from the grease trap, installing new piping per the plans and specifications, installing new pipe liner, cleaning and preparing the existing grease trap, installing sealant and removing as well as replacing the backfill with approved backfill (hereinafter referred to as the "Grease Trap Project" or "Project").

6. During the course of the scope of work, TDT encountered undisclosed and/or unknown conditions on the site which caused changes to the necessary scope of work which were not represented in the Drawings, Plans or Specifications which were a part of the Contract Documents for the Project at issue. The following necessary changes and additional costs in the scope of work occurred:

6a. During the hydroexcavating process at the site, TDT discovered the location of a sewer pipe contained within the area was in a different place from where the pipe was identified in the drawings/contract documents for the Grease Trap Project. This discovery of the new and different pipe location caused the excavation to be much larger in scope than was originally contracted for. Further, it required alternative excavation and shoring methods so that the pit could be excavated safely. The new location of the sewer pipe was not identified within the contract documents related to the Project, and thus was not known and/or disclosed to TDT prior to the commencement of the work.

6b. In addition to discovering the undisclosed location of the sewer pipe, TDT also encountered an undisclosed and/or unknown drainage/waterproofing system which consisted of a granular column unsuitable for excavation as previously planned. This granular column, at the time of construction, virtually collapsed continuously within the pit during excavation. This nonstructural material made the original pit much larger and required more shoring, more containment, more labor, and an engineered-designed backfill procedure- none of which was originally contracted-for. This drainage/waterproofing system-- using a granular column--- was not identified within the contract documents related to the Project, and thus was not known and/or disclosed to TDT prior to the commencement of the work. TDT advised Centennial of this undisclosed condition on September 30, 2013, by issuing a Request for Information, which was ignored.

6c. Additionally, TDT's scope of work excluded all forms of waterproofing, which was acknowledged by Centennial. As a result of the system's newly revealed design, the scope of work was changed, and Centennial approved this new scope of work/change, yet Centennial has not paid for the change.

6d. Further, TDT was compelled to perform dewatering services on the Project at the direction of Centennial. Dewatering was originally excluded from the scope of work, which Centennial also acknowledged. As such, Centennial approved this change in scope, instructed TDT to perform the dewatering, yet TDT has not been paid for this work.

6e. Last, the Project at issue was wrought with delays not caused by TDT's actions/inactions in any way. These delays in the Project are attributed to others' intentional, unexplained, egregious acts/inactions and lack of coordination/planning, and caused TDT great costs associated with continuing rental equipment fees, and labor costs. Thus, a change in costs was necessary.

7. Pursuant to the terms in the Agreement, TDT promptly informed Centennial of these discoveries, the necessary changes as a result of the discoveries, and the *estimated* costs for the new, necessary scopes of work.

8. Upon receiving this information from TDT, Centennial failed to fulfill its contractual obligations to promptly inform and/or advise the Owner of the property at issue, HCHD, within the time frame allowed by the contract documents. Instead, Centennial ordered the work to be completed by TDT, which TDT was compelled and had no choice but to complete per our contractual obligations. Further, Centennial knew of the increasing costs to TDT for

having to perform the new scopes of work attributable to the newly discovered issues with the site, yet did nothing to timely address these changes and/or costs with the HCHD during the course of the Project.

9. Once the Project was completed, on or around January 2014, to the satisfaction of HCHD, and to the satisfaction of Centennial, Centennial, on numerous occasions, represented to TDT that HCHD's accepts Change Order requests after projects are completed. For months following the completion of the Project, Centennial continued to make these false representations about OWNER/HCHD's procedures for accepting change orders after completion of projects. TDT wholly relied on Centennial's false representations and continued to compile, select, re-arrange, and calculate its costs in order to appease Centennial's shifting demands for the presentation of information regarding the Change Order requests.

10. However, when Centennial presented TDT's invoices to HCHD--- nearly six months after the Project was completed--- HCHD summarily denied all of TDT's invoices. HCHD's denial was based solely on the fact that Centennial did not comply with its contract with HCHD in that Centennial failed to promptly and timely notify HCHD of the requested change orders and the estimated costs associated with TDT's work.  Further, HCHD's denial specified that Centennial knew the correct contractual procedure to follow with HCHD, yet Centennial wholly failed to follow such procedure.  To this day, TDT has not been paid in full for the original contract amount, or for the work it performed pursuant to the necessary, warranted, and compelled change orders on the Ben Taub Grease Trap Project.

## III.
## CLAIMS AGAINST CENTENNIAL

### A. BREACH OF CONTRACT

11. TDT herein restates and realleges the allegations contained in the preceding paragraphs as set forth above.

12. TDT and Centennial entered into the Agreement for the performance of labor and services related to the plumbing and piping of the Ben Taub Grease Trap. *See* Exhibit A attached. TDT performed the labor and services pursuant to the Agreement. TDT is entitled to the entire balance owed under the Agreement, including the costs associated with the four change order requests pursuant to the terms of the contract documents, in that TDT submitted the change order requests in accordance with its obligations. *See* Exhibit A, “Standard Terms and Conditions”, Section 10.2, page 7 of 16. The amount unpaid for such labor and services and which is now due and owing to TDT is **TWO HUNDRED THIRTY-TWO THOUSAND SEVEN HUNDRED SIXTY-FOUR AND 52/100 DOLLARS ($232,764.52)** which amount is true, correct and just, with all just and lawful offsets, payments, and credits. This unpaid amount is comprised of the following, and as shown in Exhibit B:

a. $9,550.00: Outstanding retainage on the original Subcontract Amount.

b. $113,683.79: Invoice #2924 (Original RFI NO. 122313_01) for additional excavating, shoring, time, labor and materials associated with the discovery of the undisclosed waterproofing system.

c. $32,620.14: Invoice #2926 (Original RFI NO. 12102013_01) for waterproofing work which was excluded in the subcontract, but was approved by Defendant.

d. $30,159.39: Invoice #2925 (Original RFI NO. 122313_06) for dewatering which was excluded within the subcontract, but which Defendant approved.

  e. $46,751.20:   Invoice #2927 (Original RFI NO. 01062014_1) for excessive, intentional, unwarranted and egregious delays.

13. TDT complied with the Agreement by timely informing Centennial of newly discovered conditions which were not within the contract documents and by providing, in writing, estimates of the costs associated with the necessary changes in the work as required by Section 10.2 of the Standard Terms and Conditions within the Agreement, page 7 of 16. *See* Exhibit A, page 7 of 16, Section 10.2. However, Centennial failed to comply with its obligations pursuant to the contract documents. Specifically, Centennial did not process TDT's claims in the manner provided by and according to the provisions of the Contract Documents so as to protect the interest of TDT. *See* Exhibit A, Section 10.2, page 7 of 16. The Contract Documents, which include the Agreement between Centennial and Harris County Hospital District, required Centennial to advise the District and Architect, in writing of any change proposal within ten days of the receipt of a request for change in the work. Within the HCHD/Centennial Job Order Contract, pursuant to portion Attachment n., HCHD Conditions and Covenants, Page 21 of 33/also page 82 of 107: "Contractor (Centennial) shall advise District and Architect, in writing ("Change Proposal"), within ten (10) days of the receipt of a request for a change in the Work, of the total effect of the change in the Contract Time and Contract Sum." However, Centennial did no such thing when it became aware of TDT's requests for change orders due to undisclosed conditions at the site, and estimates for that change in scope of work. As such, Centennial breached the Agreement, and TDT suffered damages as a result.

13. Centennial further breached its contract with TDT by failing to notify the Architect that the plans/drawings and specifications provided to TDT were incorrect when Centennial was told by TDT of these issues as Centennial was obligated to do pursuant to the

HCHD Conditions and Covenants, Attachment n., Section 2.04 "Order of Precedence", page 6 of 33, (also page 67 of 107). Specifically, this provision states:

> Should the Contractor find discrepancies in, or omissions from, the Drawings, any proposals, or Specifications, or should he be in doubt as to their meaning, he shall at once notify the Architect who shall give written corrections, clarifications or instructions to the Contractor…

The contract documents, i.e. the Plans and Specifications, did not show the correct location of a sewer pipe, nor did they reveal the waterproofing system within the area at issue, nevertheless Centennial refused to take these issues to the Owner/HCHD in a timely fashion. This is despite the fact that the contract documents clearly state the "Intent of Plans and Specifications" in Section 2.03 of Attachment n of the HCHD Conditions and Covenants, page 6 of 33/page 67 of 107, which is that the Plans and Specifications is to "prescribe definite work or services to be undertaken, or materials, supplies, or equipment to be furnished by Bidder if awarded the Contract." Centennial ignored TDT's information that the contract documents--- the Drawings, Plans and Specifications--- given to TDT to bid and execute the job-- were incorrect at the time Centennial was informed, and forced TDT into finishing the Project without protecting TDT's interests. As such, TDT suffered the above-listed damages.

14. Further, Centennial has already admitted it owes TDT for the dewatering work that TDT performed, yet has failed to pay for it almost one year after its promise to do so, thereby breaching the contract.

**B. SUIT ON SWORN ACCOUNT**

15. TDT herein restates and realleges the allegations contained in the preceding paragraphs as set forth above.

16. This lawsuit has become necessary in order for TDT to recover fair, reasonable compensation for its damages arising from Centennial's breach of contract and failure to pay amounts due and owing on its account.

17. TDT provided services to Centennial on an open account. Centennial accepted the services and became bound to pay TDT its designated charges, which were to be paid according to the parties' Agreement. Centennial was invoiced for the services. The charges to Centennial are outlined within the attached invoices. *See* Exhibit B attached. The invoices attached hereto accurately set forth the services provided, the date of performance, and the amount charged for the services. *See* Exhibits B.

18. Centennial did not make any payments to TDT for these services. This claim is just and true, it is due, and all just and lawful offsets, payments, and credits have been allowed.

**C. IN THE ALTERNATIVE, THEN QUANTUM MERUIT**

19. TDT herein restates and realleges the allegations contained in the preceding paragraphs as set forth above.

20. *In the alternative*, if it is found that there is no breach of contract, and/or TDT's change order requests fall outside of the subcontract at issue, then TDT would show that Centennial is liable to pay TDT under a theory of *quantum meruit*. As stated above, TDT provided services and labor to Centennial via the work performed in the Change Order requests. Centennial knew TDT expected compensation for the services and labor provided within the Change Order requests. Centennial had ample notice of TDT's reasons for the necessary changes in the scope of work, and costs estimated associated costs for the services it provided pursuant to the Change Order requests, yet Centennial failed to pay TDT for the services and labor provided. In fact, Centennial, upon such notice, not only accepted TDT's new scopes of

work, but demanded that TDT proceed with the work in order to complete the Project. Centennial accepted the benefit of TDT's work in its entirety, including the costs associated with the changes in the scope of work, but refused to pay for it and/or see that they were processed correctly. Because of Centennial's failure to pay TDT for the services and labor Centennial has been unjustly enriched in the amount of **TWO HUNDRED THIRTY-TWO THOUSAND SEVEN HUNDRED SIXTY-FOUR AND 52/100 DOLLARS ($232,764.52).**

## D. IN THE ALTERNATIVE, THEN PROMISSORY ESTOPPEL/UNJUST ENRICHMENT

21. TDT herein restates and realleges the allegations contained in the preceding paragraphs as set forth above.

22. *In the alternative,* if no breach of contract is found, then TDT pleads promissory estoppels/unjust enrichment. TDT has substantially performed under the provisions of the Agreement. TDT provided services, labor and materials to Centennial. Centennial accepted the labor, services and materials. Centennial has failed to pay TDT for the services, labor, and materials provided. Centennial has benefited from TDT's performance under the contract. Centennial's failure to pay TDT for the services, labor and materials means Centennial has been unjustly. Thus, Centennial must be estopped from obtaining unjust enrichment. Therefore, to the extent that Centennial has benefited from the performance of TDT, Centennial should be compelled to compensate TDT for their losses.

## E. NEGLIGENT MISREPRESENTATIONS

23. TDT herein incorporates the facts set forth in Section II "Background Facts."

24. TDT's claims for negligent misrepresentation, as well as fraud, are separate and apart from TDT's claims for breach of contract in that the misrepresentations and fraudulent conduct give rise to independent liability on the part of Centennial and have caused further harm

and damage to TDT, separate and apart from the damages caused by Centennial's breach of contract with TDT. As stated above, Centennial breached its contractual obligations to TDT by not submitting TDT's Change Order requests to OWNER/HCHD during the course of the Project. During the course of the Project, Centennial refused to submit the Change Order requests for varying reasons while, at the same time, demanded that TDT complete the Project in its entirety, including the necessary changes in the scope of work.

25. Once the Project was completed however, Centennial decided to submit the Change Order requests to OWNER/HCHD. After the Project was completed, Centennial proceeded to make false representations to TDT that OWNER/HCHD accepted and paid the costs of Change Order work despite the fact that the project was complete. These statements were either false and/or were negligent misrepresentations upon which TDT relied to its detriment.

26. Centennial submitted TDT's change order requests and costs to OWNER/HCHD in July 2014, more than six months after Project completion, all the while stating that OWNER/HCHD accepted Change Orders despite the lapse in time. However, Centennial's representations were shown to be false when OWNER/HCHD confirmed these statements' falsities in HCHD's denial of TDT's invoices on the Project. Specifically, Mark Sams, Vice President in Planning, Facilities Management and Engineering at Harris Health Systems, stated in the denial letter dated August 25, 2014, that it was unfortunate that Centennial did not bring this issue to the attention of Harris Health System until after the decisions had been made and the services had been performed. Mr. Sams further stated that Centennial had done enough work with the Harris Health System *to know* that Harris Health is required by law to approve and provide proof of funding to the Vendor for projects before any work can be started, and that

those same rules apply to scope changes, and that the Purchase Order with HCHD must be increased first before changes in scope can be approved.

27. TDT's claim for negligent misrepresentation is based on the facts that Centennial knew OWNER/HCHD's procedures in accepting change orders, yet nevertheless continued to misrepresent the truth about this procedure to TDT. Centennial made these representations in the course of its business interest with its ongoing relationship with HCHD, and in order to preserve that relationship rather than acting within the best interest of its subcontractor, TDT. Justifiably, TDT relied on those representations and incurred labor costs and expenses in compiling, organizing, re-organizing, and attempting in every possible way to adhere to Centennial's alleged requirements in submitting the change order requests. As a result of TDT's reliance on Centennial's false representations, TDT suffered damages which are separate and apart from the contract damages that TDT alleges. including the labor costs and expenses it incurred as above-mentioned.

**F. FRAUD**

28. Incorporating fully paragraphs 19 through 21, TDT further pleads Centennial made false representations about OWNER/HCHD's procedures with regard to change orders to TDT which caused harm to TDT. Specifically, TDT pleads the following:

> 28.1 False Statement Made: Centennial, through its representative, Walter Won, stated that OWNER/HCHD's procedures for change order payment incorporated change orders and payments of same after TDT's work was finished. This representation was material in that it TDT attached importance to Centennial's false statements in making the decision to attempt to work with Centennial over a 6 month period in "presenting" the Change Orders to

Owner/HCHD, which included loss of time, labor, revenue, and expenses during this process.

28.2 Speaker, Walter Won, knew the statements about Owner/HCHD's alleged Change Order request procedures were false: TDT pleads that Centennial, through its representative, Walter Won, knew that Owner/HCHD's procedures regarding Change Orders, yet nevertheless misrepresented those procedures to TDT on multiple occasions from April through August 2014 after TDT's work was completed. Centennial represented to TDT that it had had prior experiences with Owner/HCHD wherein OWNER/HCHD had paid costs of change orders after certain portions of its Job Order Contract were complete. These representations were confirmed as false by Mark Sams, Vice President in Planning, Facilities Management and Engineering at Harris Health Systems (aka OWNER/HCHD) on August 25, 2014 when Sams stated in a letter regarding the request for payment of the Change Order requests that Centennial had done enough work with the Harris Health System *to know* that Harris Health is required by law to approve and provide proof of funding to the Vendor for projects before any work can be started, and that those same rules apply to scope changes, and that the Purchase Order with HCHD must be increased first before changes in scope can be approved. As such, TDT pleads that Centennial knew that its statements concerning Owner/HCHD's procedures regarding Change Orders were false in an attempt to circumvent its own misdeeds and actions/inactions regarding properly processing TDT's necessary work from the changes in the scope in the first place. Centennial, through Mr. Won, continued to make these

false representations in an effort to avoid its own liability to TDT as Centennial did not properly submit TDT's requests when Centennial became aware of them.

28.3 Centennial's false statements were made to induce TDT's reliance: Centennial knew that TDT wanted to get paid as quickly as possible for the outstanding amounts TDT was owed for the work done on the Project, and believed and relied upon Centennial's false statements about Owner/HCHD's procedures on change orders.

28.4 TDT actually and justifiably relied on Centennial's statements: As stated above, TDT's main concern and focus was to get paid for the work it was required to do and did. Therefore, when Centennial agreed the Change Orders were based on valid changes in the scope of work, and then made the false representations about Owner/HCHD's procedures for handling these change orders, TDT justifiably relied on such statements, believing that its General Contractor would not speak falsely or recklessly about their business dealings with Owner/HCHD.

28.5 TDT suffered injury sounding in tort as a result:

TDT suffered injury when it relied upon and believed Centennial's false statements about Owner/HCHD's procedures in handling change order requests and payments for same. TDT spent countless hours and expenses attempting to comply with what Centennial stated Owner/HCHD allegedly needed to process the change orders. Further, since Centennial made these representations with the knowledge of their falsity, TDT pleads for exemplary damages pursuant to Texas Civil Practice and Remedies Code, Section 41.003.

**G. PROMPT PAY ACT**

29. Pleading further, with regard to the $9,550.00 retainage amount which has still not been paid, TDT pleads that Centennial has been paid for TDT's labor and materials. As such, Centennial has an obligation pursuant to Section 2251.001 et seq. of the Texas Government Code to pay TDT within ten (10) days of being paid by Owner/Harris County Hospital District, yet has failed to do so. TDT is entitled to additional damages for interest (as penalty) pursuant to Section 2251.025 of the Texas Government Code on its unpaid invoice commencing ten (10) days following Centennial's receipt of payment from HCHD for TDT's work.

**H. NEGLIGENCE**

30. Incorporating fully paragraphs 19 through 21 and the facts within the "Background" section, TDT further pleads Centennial was negligent with regard to handling and/or mishandling TDT's outstanding invoice amounts. Specifically, TDT pleads the following:

31. Centennial had a duty to its subcontractor TDT to provide a standard of care in its dealings with HCHD, the Owner of the Property at issue, so as not to cause damage and/or harm to TDT. Centennial breached that duty by failing to act within the standard of care owed by a general contractor to a subcontractor in that Defendant/General Contractor failed to provide HCHD with the newly discovered conditions found within the Project at issue, and further failed to inform HCHD of the estimated costs associated with same, thereby extinguishing any possibility that TDT would be compensated for its work. This failure and/or breach by Centennial caused TDT's damages.

## I. CLAIM AGAINST SURETY

32. TDT sent timely and proper statutory notice to the surety defendant. On or about April 13, 2005, TDT sent notice of the claim for payment to Travelers Casualty & Surety Company. TDT is entitled to recover from Travelers Casualty and Surety Company, as surety, on the statutory payment bond in the principal amount of $9,550.00. Tex. Gov. Code Ch. 2253. Further, TDT is entitled to recover from Travelers Casualty and Surety Company, as surety, on the statutory payment bond in the principal amount of $223,214.52.

## IV. DAMAGES

33. Plaintiff hereby seek its actual damages, pursuant to its breach of contract claim, which is the outstanding balance due and owing from Defendant, including the change order request invoices as outlined in the above pleading;

34. Pursuant to TEX. CIV. PRAC. & REM. CODE ANN. §§ 38.001, et. seq., TDT seeks reasonable and necessary attorney's fees incurred in litigating its causes of action for breach of contract and suit on a sworn account. Centennial was given a demand for payment prior to the initiation of this lawsuit pursuant to TEX. CIV. PRAC. & REM. CODE ANN. §§ 38.001, et. seq.

35. Plaintiff hereby seeks its actual damages which it incurred as a result of Defendant's negligent misrepresentations, and fraudulent misrepresentations, including its costs for time, costs and expenses associated with over 6 months of repeatedly changing the way in which the change order requests were presented in order to acquiesce to Centennial's requests.

36. Plaintiff hereby seeks exemplary damages against Centennial for its fraudulent statements pursuant to Texas Civil Practice and Remedies Code, Section 41.003.

**V.**
**CONDITIONS PRECEDENT**

37. Pursuant to Rule 9(c), all conditions precedent have been performed by Plaintiff or have occurred.

**VI.**
**DEMAND FOR JURY TRIAL**

38. Plaintiff hereby demands a trial by jury and submits the appropriate fee for same.

**VII.**
**RELIEF SOUGHT**

WHEREFORE, PREMISES CONSIDERED, Plaintiff pray that:

1. Defendants be cited to appear and answer herein;
2. Plaintiff recover from Defendants the following:
   a. $232,764.52 in damages incurred and sustained as a result of Defendant's breach of contract;
   b. Costs for labor and expenses related to Defendant's fraud and negligent misrepresentations;
   c. Prejudgment interest and post-judgment interest as allowed by law;
   d. Costs of suit;
   e. Reasonable and necessary attorneys' fees; and
   f. Punitive/Exemplary damages.

Plaintiff further prays that this court award it any and all further relief, both general and special, at law or in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

**LECLAIRRYAN**

By: */s/Jane Lea Haas*____________

DAVID V. WILSON II
State Bar No.: 00786402
JANE LEA HAAS
State Bar No. 24032655
1233 West Loop South, Suite 1000
Houston, Texas 77027
Telephone: 713-654-1111
Facsimile: 713-650-0027
Email: david.wilson@leclairryan.com
Email: jane.haas@leclairryan.com

**ATTORNEYS IN CHARGE FOR PLAINTIFF, TEXAS DRAIN TECHNOLOGIES, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been duly sent via CM/ECF to all counsel of record on this the 8th day of December, 2014, as follows:

**Via CM/ECF**
Gregory C. Rota
David M. Irwin
Susanne M. Nelson
EBANKS HORNE ROTA MOOS LLP
2777 Allen Parkway, Suite 1200
Houston Texas 77019

*/s/ Jane Lea Haas*____________
JANE LEA HAAS